UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:08-cr-231-Orl-28KRS

MIRABILIS VENTURES, INC.,
AEM, INC., and
HOTH HOLDINGS, LLC

### UNITED STATES' NOTICE OF STATEMENT OF FACTS
### WHICH THE UNITED STATES CONTENDS IT WOULD PROVE AT TRIAL

The United States of America, by A. Brian Albritton, United States Attorney for

the Middle District of Florida, hereby files it Notice of Statement of Facts Which the

United States Contends It Would Prove at a Trial.

## FACTS

### The Sunshine Companies' Plan

In the summer of 2004, Frank Amodeo ("Amodeo") was introduced to John

Burcham ("Burcham"), the Chairman of the Board of Directors of Presidion Corporation,

the publicly traded parent company of Presidion Solutions, Inc. ("PSI").  PSI was a

Michigan-based holding company for several PEOs that provided comprehensive and

integrated resource management services, including payroll services, to small and

medium sized companies.  Burcham enlisted Amodeo -- to assist in bailing out his

struggling company.

In July 2004, Burcham and Craig Vanderburg ("Vanderburg"), President of PSI,

further explained that PSI was financially burdened by approximately $5 million in

unpaid payroll taxes that had been accrued by certain companies under its control, and

by continuing difficulties in maintaining a sufficient asset reserve to keep its worker's

1

compensation insurance policy in force with its insurance company, First Commercial Insurance Company ("FCIC").

PSI had previously acquired seven Professional Employer Organizations ("PEOs"), which made up PSI's "PEO book of business" (i.e., the contracts PSI had with its PEO clients). In or about May 2001, PSI acquired Sunshine Staff Leasing, Sunshine Companies I, II, III, and IV (collectively referred to as the "Sunshine Companies"). Post-acquisition, these entities did business as Presidion Solutions I, II, II, IV, and V, respectively. After PSI acquired Paradyme in or about January 2002, Paradyme subsequently did business as Presidion Solutions VI. PSI then acquired certain PEO customer contracts from BST, Inc. in or about June 2002.

The clients of the PEOs entered into contracts, or service agreements, with PSI or its subsidiaries. According to the contracts signed by the clients, when PSI or its subsidiaries started providing services to the clients PSI became the statutory employer of its clients' worksite employees under IRC § 3401(d) and assumed the liabilities and responsibilities for paying the wages of the employees and for reporting and paying over to the Internal Revenue Service the payroll taxes of the worksite employees. At the end of a client's payroll cycle, a client would e-mail, fax, or mail the number of hours worked by the worksite employee(s) to PSI. After receiving the information, PSI computed the amount of FICA, Medicare (HITS), Withholding Taxes, Workers' Compensation Insurance, and 401K contributions to be added to the clients' bill, along with PSI's administrative fee. PSI would then e-mail, fax, or mail this information back to the clients, who would either direct debit, mail, or wire the funds to PSI.

At the time that Burcham and Vanderburg commenced negotiations with Amodeo, PSI's publicly traded parent corporation, Presidion Corporation, was preparing for an annual audit.  In an attempt to have Presidion Corporation appear more profitable as a publicly traded company, PSI wanted the Sunshine Companies' payroll tax liabilities removed from Presidion Corporation's financial statements.

On October 18, 2004, Craig Vanderburg, on behalf of PSI, signed a "Consultant Agreement" with Amodeo, acting on behalf of AQMI Strategy Corporation ("AQMI"), a corporation which Amodeo created for this purpose.  The Consultant Agreement called for AQMI to provide tax advice to PSI for a non-refundable fee in the amount of $150,000.00 and an additional fee of 25% of any tax savings of the company's current payroll tax liability.  After payment of the initial $150,000.00, the Consultant Agreement provided that, commencing in January 2005, PSI would pay $75,000.00 per month to AQMI.

During the course of the due diligence investigation, it was discovered that the Sunshine Companies' accrued tax liabilities were actually much larger than had originally been disclosed to Amodeo, amounting to approximately $13 million (including interest, penalties, and taxes) as of October 2004.  Amodeo initially concluded that he could achieve the objectives sought by Presidion Corporation by purchasing the Sunshine Companies himself.  Amodeo's plan (the "Sunshine Companies Plan") was to have Wellington Capital Group, Inc. ("Wellington"), a Nevada corporation wholly owned by him, purchase the Sunshine Companies from PSI and thereby relieve Presidion Corporation's consolidated financial statements of the Sunshine Companies' accumulated payroll tax liabilities.  Amodeo did not have the funds to make the purchase so he had to use AQMI's funds (received from PSI) to make the purchase.

3

Prior to the sale of the Sunshine Companies' stock to Wellington, the Sunshine Companies would sell all of their client service agreements, subscriber agreements, accounts and notes receivable, bank accounts, and other assets to a PSI subsidiary, Paradyme.  After the sale of the Sunshine Companies' stock to Wellington, and after the winding down of the companies, including negotiations with the IRS and the conclusion of several pending courts cases in which the companies were involved, the companies would be administratively dissolved.

Several of the parties involved with or which were to be part of the implementation of the Sunshine Plan, sought legal advice as to the legality of the payroll tax implications of the Sunshine Plan.  The Fort Lauderdale law firm of Berman, Kean & Riguera provided legal advice to the parties.  Elena Wildermuth, an associate at Berman, Kean & Riguera, provided a legal memorandum regarding these issues ("Wildermuth Memorandum").  While Wildermuth's Memorandum was supportive of the viability of the central objective of the transaction, i.e., ridding the Presidion balance sheet of the Sunshine Companies' liabilities, it also recognized that any individuals who had played a role in the original diversion of the payroll taxes by the Sunshine Companies would remain liable for the taxes under the "100 percent penalty" imposed by IRC § 6672, which imposes liability on individual officers and employees to the extent that they are determined to be "responsible persons" for the collection and payment of the payroll taxes.

<u>The Wildermuth and Flynn Memoranda</u>

The Wildermuth Memorandum provides a relatively broad overview of the statutes and court decisions dealing with the collection and payment of payroll taxes. As set forth in the memorandum, the Internal Revenue Code requires the payment of a

variety of taxes by corporate employers with regard to the earnings of the employees. The employees' income taxes and FICA taxes must be deducted and withheld from the employees' paychecks, and are collectively referred to as "trust fund taxes" to reflect the fact that the employer is essentially acting as an intermediary for the IRS in collecting and paying over these taxes that are being assessed, not against the employer, but against the employees.  Employers are required to report the withheld income taxes and the employer and employee portions of FICA taxes on a quarterly basis on Form 941 unless the employer has an annual liability of less than $1,000.00 for FICA and withheld income taxes.  In the latter case, only an annual filing using Form 944 is required.  The FUTA taxes are reported annually on Form 940.  In Florida, the SUTA taxes are reported and paid quarterly on Form UCT-6.

The Wildermuth Memorandum described in detail the legal obligation to hold payroll tax funds for the Internal Revenue Service.  The Wildermuth Memorandum also established that § 6672 does not apply to corporations, such as Presidion Corporation, because a corporation is not a "person" as defined in the statute.  Consequently, the memorandum devotes little attention to the rules regarding an individual's potential liability under the statute.

In a later dated memorandum from Berman, Kean & Riguera, it was stated that IRC § 6672 provides that any person required to collect, truthfully account for, and pay over any Title 26 tax who willfully attempts in any manner to evade or defeat the payment of the tax shall be subjected to a penalty amounting to 100% of the tax (where there are multiple responsible persons, they are jointly and severally liable for the 100% penalty).  This means that separate and apart from corporate liability for the unpaid

taxes, individual officers and employees of a corporation may find themselves personally liable for the unpaid trust fund taxes.

Like the Wildermuth Memorandum, the subsequent memorandum concludes that corporations will not be liable under § 6672 for the Sunshine Companies' unpaid payroll taxes, albeit based on a different rationale, i.e., that corporations, even if they could be construed as "persons" within the ambit of the statute, did not have the necessary responsibility for or control over the payroll tax obligations of the Sunshine Companies to trigger liability under § 6672.

<u>Early IRS Negotiations Over the Sunshine Companies' Tax Liabilities</u>

On January 6, 2005, Amodeo, Richard Berman, Jose Marrero, Daniel Myers, and Hans Beyer attended a meeting at the office of the Plantation, Florida branch of the IRS Collections Division with Revenue Officer Judith Berkowitz.  At the meeting, the details of non-payment of taxes by the Sunshine Companies were discussed.  Revenue Officer Berkowitz was told at that time that the trust fund portion of the overall tax liability, exclusive of interest and penalties, was believed to be approximately $25 million.

The ensuing months were spent administratively winding down the business of the Sunshine Companies, including concluding pending litigation involving the companies.  Many of these lawsuits were handled by Berman's law firm.

There were also additional contacts with Revenue Agent Berkowitz during this time period.  On or about April 21, 2005, Jose Marrero met with Revenue Officer Berkowitz, at which time she informed him that the total liabilities for just one of the Sunshine Company entities, Sunshine Staff Leasing, appeared to be in excess of $24 million.  She provided Marrero with a list of questions, including asking why no deposits were made during the first quarter of 2005 and whether another company had taken

over the business.  She also wanted to know more generally what plans were being made to pay the outstanding liabilities.  She gave Marrero until June 1, 2005 to obtain the requested information.  According to Marrero's written recollection of the meeting, Revenue Agent Berkowitz appeared "to be very cooperative and flexible at this time." On May 11, 2005, Revenue Agent Berkowitz sent Marrero a fax updating her analysis of the outstanding tax liability for Sunshine Staff Leasing, including penalties and interest which she calculated at that time to total approximately $26 million (this was the liability for just one of the Sunshine Companies).  Via e-mail, Marrero subsequently updated Myers on the status of the case, indicating that Revenue Officer Berkowitz "has been very cooperative and understanding so far and I want to keep the relationship very positive and working in our favor."  Sometime prior to the June 1st deadline, all of the information Revenue Officer Berkowitz had requested was provided to her, with the exception of certain tax returns that had not been deconsolidated from the Presidion Corporation return and adjusted as of that time.  Revenue Agent Berkowitz was also informed that the Sunshine Companies' book of business was now owned by a new subsidiary of Presidion Solutions VI, d/b/a Paradyme, Inc. (discussed more fully below).

Subsequent to the disposition of the Paradyme note, the last remaining assets of the corporations were liquidated and the Sunshine Companies were administratively dissolved in the late summer of 2005.

The final assessment of the Sunshine Companies' tax liabilities, including penalties and interest, was approximately $52 million.  Although the IRS has continued to pursue the former principals of the Sunshine Companies for their personal liability under the 100% penalty, it has never asserted liability for the Sunshine Companies' taxes against Presidion Corporation or PSI.

The PBS Plan

On or about January 1, 2005, PSI purchased a South Florida PEO, Professional Benefits Solutions, Inc. (subsequently renamed Presidion Solutions VII, but referred to herein as "PBS").  Immediately thereafter, PSI began reporting all Florida employees under the PBS EIN number.  All non-Florida employees were reported under the Paradyme EIN number.  As of April 20, 2005, PBS had no federal tax liability.  At this point in time, Amodeo was not involved in any of the financial or operating decisions at PBS, and had no involvement in decisions as to how to process the individual employees' payroll.  These decisions were made by the management of Presidion Corporation.  However, as discussed above, Mirabilis held a substantial minority stake in Presidion until January 2006.

In May 2005, Amodeo was again approached by Vanderburg and Baiers regarding further problems with Presidion Corporation, including a severe shortage of working capital, liabilities (including payroll tax deficiencies) totaling millions of dollars, and of most urgency, the potential cancellation of its workers' compensation insurance policy with FCIC.  Amodeo proposed a plan that involved consolidating and settling the Presidion liabilities into one secured claim owed to the IRS.

Amodeo's plan took another turn in July 2005 when he was notified that the Presidion workers' compensation policy with FCIC would be cancelled within days.  Moreover, the insurance underwriter that they were negotiating with to take over the policy, Sunz Insurance, refused to do business with Vanderburg or Baiers.

In order to facilitate the PBS Plan and the aforementioned disbursements, Amodeo advised Vanderburg that any and all diverted payroll tax funds be deposited into a PSI account opened by Vanderburg at First Southern Bank in Fort Lauderdale

8

(the "Reserve account").  Amodeo was given sole signature authority over this account.
As the sole signatory on the Master Account, Vanderburg was consequently personally
involved in the transfer of the payroll tax funds to the Reserve Accounts.  The funds
were later disbursed from the Reserve Account by Amodeo for his and the co-
conspirators' benefit (unrelated to the payment of payroll taxes).  From June 10, 2005
until December 31, 2005, Amodeo and Vanderburg caused to be transferred
approximately $64,600,000.00 to the Reserve Account from the Ultimate Master
Account.

The parties entered into an Indemnification Agreement whereby PSI promised to
pay Mirabilis $50,000,000.00 by December 31, 2005, in return for Mirabilis' agreement
to hold PSI harmless for any subsequent claims against the company, up to a maximum
of $70,000,000.00.  The Agreement was executed by Dr. Pollack as Vice President of
Mirabilis and Vanderburg as President of PSI, and ratified by the Mirabilis Board of
Directors, which at the time included Edie Curry, Jason Carlson, Dr. Pollack, James
Sadrianna, and Bruce Walko.

<u>IRS Negotiations and Related Discussions in Early 2006</u>

At the beginning of 2006, arrangements were made for a January 20th
conference with Revenue Officer Berkowitz in Plantation to lay down the groundwork for
a formal installment plan to resolve both the Sunshine Companies' payroll tax debt
(which at that time was estimated to be $52 million) and now the PBS debt (at that time
estimated to be $71 million).  This was the first time that Revenue Officer Berkowitz was
made aware of the PBS payroll tax liability.  Myers checked with Vanderburg to ensure
that Vanderburg had properly filed the 941 tax returns for the third and fourth quarters of
2005.  Vanderburg initially indicated that they had been prepared by Melanie Levigne,

9

the Presidion Corporation tax manager, and filed electronically.  However, he was
unable to produce a signed version.  Vanderburg then printed and signed new copies of
the tax returns that were mailed to Myers and to Revenue Officer Berkowitz in
Plantation, Florida.

<u>AEM's Assumption of Formal Ownership of PBS Book of Business</u>

On or about April 29, 2005, Mirabilis purchased AEM for approximately
$125,000.00.  At the time of the purchase, AEM was a PEO shell.  Amodeo and the
other co-conspirators intended to transfer Presidion Solutions' book of business to AEM,
because AEM had a better SUTA rate than Paradyme or PBS and because the
Presidion Solutions name was tainted in the PEO industry.

On or about January 5, 2006, Paul Glover was hired as CFO of Mirabilis.  At the
beginning of August 2006, Amar was replaced as President of AEM by Michael Stanley,
a C.P.A. who had been the CFO of a large Central Florida staffing company, Workers
Temporary Staffing, Inc. ("WTS").

Reflecting the change of ownership, as of January 1, 2006, all funds collected
from the PEOs were deposited into an AEM d/b/a Mirabilis HR bank account with Bank
of America.  Although Sue Schumacher, Presidion's CFO, managed the account, the
decisions about the disbursements from the account came from Vanderburg and
Amodeo.

From the BOA depository account, the monies were disbursed to various other
AEM accounts for the payment of payroll, operating expenses, taxes, etc.  Funds used
for the acquisition of new business assets would be transferred from the BOA
depository account to an account maintained by Mirabilis at SunTrust Bank in Orlando
or to Berman's law firm trust account at First Southern Bank in Fort Lauderdale.

Transfers were made from AEM's operating account to PSI's account at SunTrust Bank in Orlando (the "PSI Capital Account") to pay Presidion related expenses and for the purchase of two businesses, WTS and Winpar (a real estate development project based in Nashville, Tennessee purchased for approximately $3 million), both of which provided security for Presidion within the context of the Indemnification Agreement.

AEM submitted a 941 return to the IRS properly showing the tax liability for the first quarter of 2006, the amount that had been paid, and the deficiency remaining. Approximately two-thirds of the taxes had been paid, reflecting the fact that proper collection and payment procedures had been followed for the short period from January 1, 2006 through late February 2006.

Stanley and the Mirabilis Board of Directors decided to continue to operate the PBS book of business pursuant to the pre-existing Management Agreement executed in 2005. AEM retroactively amended the Management Agreement in order to justify the company's control over the PBS book of business through March 31, 2006. The amendment extended the term of the Management Agreement through August 1, 2006. A new 941 was consequently prepared for PBS, which reflected the same tax collection as the 941 Form originally filed for AEM, but differed from that Form in that it showed zero tax deposits with the IRS during the first quarter of 2006.

Disclosure of the Grand Jury Investigation

In the last week of November 2006, Presidion PEO customers began receiving subpoenas from the Orlando office of the U.S. Attorney's Office for the Middle District of Florida relating to PEO tax collections during the 2004-2005 time period. The customers informed AEM of the subpoenas and asked for help in complying with the subpoenas. AEM personnel informed Dan Myers, and both Amar and Myers eventually

informed Amodeo.  The key personnel at Mirabilis, including those who had been

present since the implementation of the Sunshine Companies Plan, then began to leave

the company.

<u>Amodeo's Use of December 2006 Payroll Taxes for Non-Tax Purposes</u>

On or about December 15, 2006, the Directors of Mirabilis met with Amodeo and

informed him that they wanted to sell all of the PEOs and discontinue any further

involvement with them.  Amodeo indicated that he believed he could arrange for a sale

of the PEOs to an unrelated company, Paysource, with which Mirabilis had already

been in acquisition negotiations.  In essence, Amodeo proposed reversing the

transaction by having Paysource buy the PEO contracts and then having Mirabilis

shareholders buy the stock of Paysource.  It was believed that Paysource's note

payments on its purchase of the PEOs would provide the necessary funds to allow

Mirabilis to meet its ongoing obligations on a much scaled down operation that would no

longer include the PEOs.  It was also hoped that this would provide some insulation for

Mirabilis from liability for the historical unpaid payroll taxes, simply by virtue of the fact

that Mirabilis would have retired from the PEO business after learning of the

government investigation.

One of the problems with this plan was that Mirabilis would have to terminate a

significant portion of its workforce, and it then lacked the funds to pay the employees

and their health and benefit claims.  In order to make payroll for December 15th to

January 1st, funds from the PBS trust fund tax collections were used to pay Mirabilis'

final payroll and health plan obligations, as well as the health plan obligations of all of

the PEO employees.

<u>Total Unpaid Payroll Taxes</u>

It is the position of the government that co-defendants AQMI, PSI and PBS, and Amodeo and other members of the conspiracy, knowingly failed to remit to the Internal Revenue Service payroll taxes totaling in excess of $120,000,000.00.

<u>Hoth Holdings</u>

Defendant Hoth was a Nevada Limited Liability Corporation, which was a 90% owned subsidiary of Mirabilis and was created in December 2005.  Hoth acquired commercial property located at 3801 Carolina Ave., Richmond, Virginia in May 2006. Mirabilis provided $1,419,867.37 in funds to facilitate the purchase of the real estate from December 2005 through June 2006 in a series of wire transfers and checks. These funds provided by Mirabilis were recorded on Mirabilis' books initially as a deposit, then as an investment in the real estate, and later corrected to be a receivable from Hoth.  Mirabilis obtained these funds from AEM, Inc., Titanium Technologies, Inc., PSI, AQMI, and other companies owned by Mirabilis or Frank Amodeo.

A. LEE BENTLEY, III
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515A


By: <u>s/ I. Randall Gold</u>
Assistant United States Attorney
Deputy Chief, Orlando Division
Florida Bar Number 0268062
501 West Church Street, Suite 300
Orlando, Florida  32805
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail:        randy.gold@usdoj.gov

U.S. v. MIRABILIS VENTURES, INC., et al.          Case No. 6:08-cr-231-Orl-28KRS

CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2010, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to the following:

> AEM, INC., d/b/a Mirabilis HR
> MIRABILIS VENTURES, INC.
> HOTH HOLDINGS, LLC
> c/o Richard Lee Barrett, Esquire
> 18 Wall Street
> Orlando, FL   32801

I hereby certify that on June 15, 2010, a true and correct copy of the foregoing

document and the notice of electronic filing was sent by U.S. Mail to the following non-

CM/ECF participant:

> N/A

> *s/ I. Randall Gold*_____
> Assistant United States Attorney
> Deputy Chief, Orlando Division
> Florida Bar Number 0268062
> 501 West Church Street, Suite 300
> Orlando, Florida  32805
> Telephone:   (407) 648-7500
> Facsimile:   (407) 648-7643
> E-mail:        randy.gold@usdoj.gov